Argued September 20, affirmed in part; reversed in part and remanded December 18, 1978

KNOETZEL, *Petitioner,*
*v.*
STATE ACCIDENT INSURANCE FUND,
*Respondent.*
(WCB Case No. 77-3686, CA 10848)
588 P2d 89

Phil H. Ringle, Jr., Gladstone, argued the cause for petitioner. With him on the brief was Rodney J. Beck, Gladstone.

Gene L. Platt, Associate Counsel, State Accident Insurance Fund, Portland, argued the cause for respondent. With him on the brief was K. R. Maloney, Chief Counsel, and James A. Blevins, Chief Trial Counsel, Salem.

Before Schwab, Chief Judge, and Thornton, Tanzer* and Buttler, Judges.

---

*Tanzer, J., did not participate in this decision.

[ 627 ]

**BUTTLER, J.**

In this Workers' Compensation case, claimant, a 60-year-old bus driver, appeals from an adverse decision of the Workers' Compensation Board (Board) holding that his psychological disability did not arise out of his employment. It is clear from the record that claimant suffers from severe paranoia, and that it was necessary for him to leave his employment as a result thereof.

It is claimant's contention that he was physically and mentally in good health until October, 1975, at which time a fellow employee insulted him by suggesting, without any foundation in fact, that claimant was a homosexual, following which incident many other employees were verbally and by gesture insulting toward him, and menacing situations were created by others to threaten him. He enumerated many "incidents" which he interpreted as intended to malign, embarrass or threaten him, and which led to his present disability and his terminating his employment in March, 1977.

We agree with the Board and the referee that the record does not support claimant's contention that the disability arose out of his employment. *See Friesen v. Gould, Inc.,* 18 Or App 120, 523 P2d 1285 (1974); *Williams v. SAIF,* 36 Or App 211, 584 P2d 327 (1978). Claimant first sought professional medical help in March of 1977 while he was still working, when he consulted Dr. Davis, a clinical psychologist. Dr. Davis saw claimant three times, after which he advised him to seek psychiatric consultation, and recommended that he discontinue working temporarily. Dr. Davis's report states that claimant complained of being mistreated by fellow employees for "unexplained and obscure reasons," but attributed their motives to resentment or jealousy. The report also states:

"* * * He has no history of legal infraction, and makes a point of specifically denying any unnatural or deviant sexual conduct at any time in his life, because he

feels others have made defamatory remarks in this regard."

There is nothing in that report to indicate when claimant's problem began, or what started it. Claimant was then referred by his attorney to Dr. McCulloch, a psychiatrist, in April of 1977, who reported that claimant related the onset of his problem to an "incident" which he said occurred at work about 1½ years earlier. At the hearing, claimant testified that when he and another employee were together they would tell each other dirty stories. On the occasion in question the other employee told a story involving "queers," after which claimant said, "Oh, are you one, too?", to which his fellow employee responded, "I kind of thought you was one." From then on, according to claimant, other employees made insulting remarks or gestures to or concerning him. He submitted a lengthy catalogue of "events" he interpreted as being directed toward him.

Both the employer and SAIF attempted to investigate the matter, but claimant was unable to name any of the fellow employees who might have been involved. It appears from the record that the only "incidents" or "events" which could be confirmed are those mentioned in the dissenting opinion. There is no evidence that any of those events involved fellow employees. There were two "hangman's noose incidents," one of which was described by a regular passenger on claimant's bus as a wire loop on a telephone pole along the road, and another as a wire coat hanger hanging in the men's room of a doughnut shop near Tigard, which the bus drivers frequented, on which the shop's employees hung things. The "shoes in the refrigerator incident" was confirmed as involving an employee of the same doughnut shop who kept his shoes there while he was off duty so that the cook would not wear them. A doughnut shop employee showed claimant the shoes in the refrigerator, which claimant interpreted as being children's shoes which were shown to him to suggest

that he must be the kind of pervert who would eat children's shoes.

The barricade across the road "incident" was nothing more than that, but claimant considered it as intended to hinder his bus. There is no evidence that a fellow employee was involved in *any* of the "confirmed" incidents on which the dissent relies. Dr. McCulloch assumed that the incidents which purportedly involved co-employees of claimant did, in fact, occur, but were misinterpreted by claimant. Accordingly, he relates claimant's psychiatric problems to the job. The evidence, however, does not support that assumption.

The other psychiatrist, Dr. Colbach, was of the opinion that claimant's condition was not job-related and that claimant was a "casualty of life," not of his job.

The record as a whole does not persuade us that the "triggering" incident was any more real than the numerous incidents related by claimant which were either fanciful or clear misinterpretations of real ones, or that he was, in fact, harassed by fellow employees. Accordingly, we hold that claimant has not sustained his burden of proof that his disability arose out of his employment.

Claimant also assigns error to the Board's order awarding reasonable attorney's fees to claimant to be paid out of a 25% penalty imposed by the Board because of the respondent's unreasonable resistance to the payment of compensation from the date it had notice of the claim until payment of compensation was first made. *See Jones v. Emanuel Hospital,* 280 Or 147, 570 P2d 70 (1977); *Williams v. SAIF,* 31 Or App 1301, 572 P2d 658 (1977); ORS 656.262(8). Respondent concedes that the penalty and attorney fees must be determined and imposed separately. Accordingly, we must reverse that portion of the Board's order and remand for a proper order.

Affirmed in part, reversed in part and remanded.

**THORNTON, J.,** dissenting.

It is undisputed that claimant is now suffering from an abnormal mental condition, namely a "paranoid state." Both psychiatrists agree to this diagnosis. The sole issue then is whether his condition arose out of and in the course of his employment.

My reading of this record convinces me that claimant's employment was a material contributing cause of his present admitted mental illness.

I base my conclusion on the testimony of Dr. McCulloch and the reports of Drs. McCulloch and Davis that claimant's psychiatric disability was triggered by the incident that occurred on the job in October 1975, when the subject of male homosexuality came up in the course of a discussion between claimant and a fellow worker and the other man indicated to claimant that he thought claimant might be a homosexual. Claimant's mental condition progressively worsened from this point on, including a considerable amount of "highly unrealistic or delusional thinking."

In my view, claimant's evidence was far and away more credible and more probative than that presented by the employer.

Claimant was first referred to Dr. Davis, Ph.D., a clinical psychologist, by his attorney.

Dr. Davis conducted three diagnostic interviews in March 1977, and reached the following psychological evaluation of claimant:

> "Mr. Knoetzel is an agitated and depressed person whose disability is largely work-related. He is rather naive, trusting and generous to his own detriment but, at present, becomes easily hurt and wonders why others seem so intolerant of him.
>
> "He appears headed for an even more profound and complete breakdown unless treated at this time, and is preoccupied with a sense of impending collapse. At the

same time he worries obsessively about debts, financial security and details of lesser significance.

"These characteristics and the interview and test results indicate the presence of a serious psychological disturbance with mixed elements of behavioral and mental disorder. It is appropriate to refer him for a psychiatric consultation and, meanwhile, to advise that he discontinue working temporarily as a means of relieving his immediate pressures until a comprehensive treatment plan is developed."

Dr. Davis thereupon referred claimant to Dr. Michael McCulloch, M.D., a practicing psychiatrist in Portland. Dr. McCulloch was claimant's treating doctor. He saw claimant a total of seven times over a period of approximately four months. In addition he had several telephone conversations with claimant in which he discussed claimant's mental problems.

The following are pertinent excerpts from Dr. McCulloch's testimony:

"Q. Dr. McCulloch, I gather that your opinion is the work stress was a materially contributing cause to your diagnosis of paranoid state?

"A. Based on the information available to me, that would be my conclusion.

"Q. So that we understand, Dr. McCulloch, is it probable the work was the cause of this condition?

"A. In my estimation Mr. Knoetzel's work situation was the probable cause of the development of his paranoid state.

"Q. In determining and coming to that conclusion, you took into consideration the individual, as you have stated. Did you take into consideration the stressfulness of his work, the type of work?

"A. Yes.
"* * * * *

"A. Some people who are paranoid do not have a focus for their paranoia. It is generalized or it can be an audiloric hallucination. In Mr. Knoetzel's case, however, it was highly isolated to a work environment for a period of 16 months before it began to generalize beyond that and I feel that the stress, when you're dealing with a

[ 633 ]

vulnerable person like Mr. Knoetzel, was sufficient, perhaps unfortunate, but did occur at his place of employment and continued to escalate as a result of a combination of misunderstandings and misperceptions on his part by an increasing concern that these be resolved and somehow he be cleared of these charges or feelings. These were dismissed and my understanding from Mr. Knoetzel and his wife, he even tried to be his own attorney, tried to entertain a number of moves that would help bring these allegations to a stop. He wanted to have his name cleared."

Further, Dr. McCulloch testified that he had contacted Mr. Mountain, the Safety Coordinator for the employer, regarding claimant's assertions of harassment by fellow employes; that they made veiled references to his being a homosexual and that the supervisor "confirmed they did exist" and that claimant "had been frustrated somehow [because] actions had not been taken to stop them."

Questioned as to whether claimant could have been imagining the incidents in which these aspersions of homosexuality and other harassment had occurred, Dr. McCulloch replied:

"If we keep in mind what a paranoid delusion is, it is a misinterpretation of a real occurrence as opposed to hallucination which would be hearing of a voice or seeing something imaginary. I think a conversation did take place which provoked this and it may have been a misinterpretation on his part, but I don't think the conversation was imagined."

As to the triggering effect of the 1975 incident, Dr. McCulloch said:

"A.   Based on the information I have, I would say it is the probable cause, the information being Mr. Knoetzel's statements, Dr. Davis' report, Mrs. Knoetzel's statements to me which reaffirmed Mr. Knoetzel's concerns.
"* * * * *

"Q.   And that incident in 1975 that you call probable cause may well, isn't it true, have been a very innocuous, misunderstood fact?

"A. Yes, and always understand I think it would be a mistake if we look to a single event. If we are dealing with this, we have to look at a sequence of fairly rapid-fire misinterpretations that got it going. I think this was one, certainly, but in the absence of this one it is possible that in this close working environment with other drivers a similar kind of thing could have been fostered on the following day, for example."

Further, with reference to whether the numerous incidents of alleged harassment by fellow employes were real or imagined, Mrs. Nowland, a retired secretary for the Oregon Lung Association who had known claimant for 10 or 12 years and had ridden on claimant's bus, testified that she had personally seen a wire noose hanging from a pole on the Greenberg bus route, and that she was on the bus the night a barricade was across the road. Both of these incidents were included in the list of events claimed by claimant as being examples of harassment by fellow employes. Asked if the barricade had any significance to her, Mrs. Nowland replied:

"A. Not really to me, but it could have meant something someone was trying to hinder his bus from going [sic].

"Q. Is that the way Mr. Knoetzel interpreted it?

"A. I think so. He thought it was put there just so he would be delayed.

"Q. With regard to his changes, this is reflective over the last year you have seen in Mr. Knoetzel?

"A. Right."

The investigator for State Accident Insurance Fund (SAIF) testified that he had talked to the Tri-Met people; that two Tri-Met supervisors acknowledged that claimant had complained of harassment to them on at least two occasions, but that they were unable to identify anyone who had been harassing claimant; that claimant was unable to give him the names of any of those whom he claimed were harassing him.

However, the investigator testified that he was able to establish that there was in fact a wire noose in the

men's room in the doughnut shop which the drivers used, and that there was a pair of shoes in the refrigerator at the doughnut shop. Both of these items were mentioned in the list of alleged harassing incidents prepared by and testified to by claimant, thus arguably showing some factual corroboration for claimant's assertions.

The only medical evidence that claimant's mental problems were not job-related was the opinion of Dr. Colbach, the psychiatrist who testified for SAIF. It was his opinion that the pressures of claimant's job, the on-the-job homosexual aspersions, real or fancied, and the claimed harassment by fellow employes had nothing to do with claimant's mental breakdown; that claimant's paranoia was the result of "male menopause" and not job-related.

His opinion was based not on treating claimant, but on examining claimant for one hour.

Dr. Colbach was willing at one point at least to concede that

"[p]erhaps some things did happen at Tri-Met, I don't know. Maybe somebody did make some vulgar statement or vulgar sign to him but * * * it is my impression he has distorted, blown way out of proportion whatever did happen * * *.

"* * * * *

"* * * Like maybe someone did call him a queer, I don't know. That isn't enough to explain the extensive delusional system he has about Tri-Met."

Also, Dr. Colbach agreed that claimant had a preexisting weakness in his mental makeup.

Dr. McCulloch, in explaining why he disagreed with Dr. Colbach, testified:

"I do feel from discussions with Mr. Knoetzel, in reviewing the findings with his wife and with Dr. Davis, that we are dealing with a situation that involves a stress which would occur at his place of employment which for approximately 18 months involved a delusional system that was isolated to his employment and only

[ 636 ]

as he became completely disorganized did it generalize beyond that. I feel as Dr. Colbach has indicated in his report and the portion of the testimony I heard, that Mr. Knoetzel's premorbid personality, his own personality structure indicates he has some excessive sensitivities and certain vulnerabilities. I do feel the fact aggravation did occur at his place of employment and I don't agree that it is a matter of time or just a matter of coincidence where this occurred. Many paranoid reactions are very reactive if a sensitive or overly sensitive person has an excessive need to please and let there be continued encounters hostile or environmental, overtly difficult environmental situations that can serve as the precipitant event. My disagreement with Dr. Colbach primarily has to do with his statement, 'In my opinion the stress was not of significance to warrant this level of decomposition.' I think the stress was of significance and that we have to keep in mind we are not dealing with Dr. Colbach or myself or someone else in this room. We are dealing with Mr. Knoetzel who is a fairly vulnerable person who does not take a lot of stress, just like it doesn't take a lot of stress to injure some person's back who has weak back muscles. I think Mr. Knoetzel has some vulnerable features that made him more vulnerable to that stress * * *."

The record shows that prior to this time claimant had no mental illness and had never consulted a psychiatrist. Likewise there was no history of mental illness in his family. His present disability did not occur as a result of this single incident, but developed from that event and worsened steadily over a period of time.

He apparently performed his duties as a bus driver for the Tri-Met for seven years prior to his mental breakdown without experiencing any psychiatric difficulties.

It is well settled in Oregon workers' compensation law that an employer takes the worker as he is. Both this court and the Supreme Court have held in a series of workers' compensation decisions that an aggravation or an acceleration of a preexisting disease or

weakness is compensable. *See* for example, *Beaudry v. Winchester Plywood Co.,* 255 Or 503, 469 P2d 25 (1970).

In *Patitucci v. Boise Cascade Corp.,* 8 Or App 503, 495 P2d 36 (1972), we held that a psychological disability which is causally related to the claimant's employment is compensable. *Patitucci* involved a woman office worker who had worked for 25 years. She fell and injured her neck and arms while at work. Although she became totally disabled the medical evidence was that the major cause of her disability was an underlying psychological condition rather than a physical condition. Nevertheless, we concluded that inasmuch as the psychological problem was a contributing factor there was a causal relationship to her employer and therefore the injury was compensable. *Accord: Wilson v. Weyerhaeuser,* 30 Or App 403, 411, 567 P2d 567 (1977).

The Michigan Supreme Court in three recent decisions,[1] all handed down at the same time, consolidated on appeal, has adopted the rule which I would apply here, namely, that a subjective standard should be applied in workers' compensation psychiatric disability cases in determining whether a particular workman has suffered a psychological injury or disability. *See Deziel v. Difco Lab, Inc.,* 394 Mich 466, 232 NW2d 146 (1975).

*See also* 1 Larson, Workmen's Compensation Law, § 12.20, p 3-231, cited by the Michigan court in reaching the above conclusion.

In the interests of conserving space I will not undertake a statement of facts of the above cases. Suffice it to say that *MacKenzie v. General Motors Corporation* (one of the above consolidated cases) bears the closest factual similarity to the case at bar. It

---

[1] *Deziel v. Difco Laboratories, Inc.; Bahu v. Chrysler Corporation;* and *MacKenzie v. General Motors Corporation.*

involved a hyperconscientious General Motors employe (claimant) who allegedly developed a psychiatric disability because of worrying over the consequences of the persistent use by fellow employes of certain defective parts in assembling General Motors automobiles.

It seems to me that the above rule adopted by the Michigan Supreme Court is but a logical application of the well-established and oft-repeated rule followed in this state which I mentioned earlier in this opinion, namely, that the employer who chooses to employ a partially handicapped or injured workman takes that workman as he finds him.

All things considered, it is my conclusion that the opinions of Drs. Davis and McCulloch are more convincing than that of Dr. Colbach. I would hold that the abnormal mental condition claimant is now suffering from arose out of and in the course of his employment and is therefore a compensable injury within the meaning of ORS 656.005(8).

For the above reasons, I respectfully dissent.